I hereby certify t̶ ... to be a true and
correct copy of the ... file in
this court.

DAYTO... ...PAL COURT
Ed... ...Clerk
By ... ...Deputy

The STATE of Ohio, Appellant,

v.

HUNT, Appellee.

[Cite as *State v. Hunt* (1989), 63 Ohio App.3d 471.]

Court of Appeals of Ohio,
Huron County.

No. 4–88–24.

Decided June 30, 1989.

*Michael R. Fegen*, Prosecuting Attorney, and *Richard Grimes*, for appellant.

*Harold Freeman*, for appellee.

ABOOD, Judge.

This is an appeal from a decision of the Huron County Court of Common Pleas, which granted in part defendant-appellee Erwin Mitchell Hunt's motion *in limine* as to certain out-of-court statements of an alleged sexual battery victim. Appellant, the state of Ohio, sets forth one assignment of error:

"I. The exclusion of the video taped excited utterance of Debra Hunt was not reasonable and constituted prejudicial error."

The facts giving rise to this appeal are as follows. In February 1988, Debra Hunt, a twenty-five-year-old mentally retarded woman, resided in Fitchville, Ohio, with her mother, three brothers and her father, appellee, Erwin Hunt. The record reveals that on February 23, 1988, John Hunt, one of Debra's brothers, looked into a bedroom and observed appellee jumping bare bottomed into one bed and Debra, her pants down to her knees, lying in another. Later that same day, John went to see his other sister, Marjorie Ours, who lived in Wakeman, Ohio, and related to her what he had observed. Marjorie then contrived to get Debra to her home where later that same evening she approached her in an attempt to discover what had happened. Debra, in response to Marjorie's inquiry, said "it hurts" and "Daddy jumped in bed"; "Daddy told me pull my pants up"; "hurts, hurts." Debra also pantomimed her daddy unzipping his pants, taking out something, saying "that he takes out, put inside and hurts." Debra was subsequently taken by family members to a psychologist, Dr. Shornberg, who referred her to a counselor, Clarice A. Henry–Parham. On February 29, 1988, Parham met with Debra and through conversation and the use of drawings of male and female figures, Debra drew a picture which suggested sexual abuse. Parham also elicited statements from Debra that her daddy had touched her and it hurt. Debra's family notified the Huron County Sheriff's Department of the alleged sexual abuse and through the department a videotape interview was scheduled for Debra. On March 10, 1988, Debra was interviewed on videotape by Judith L. Csehi, supervisor of the Adult Central Services Unit at the Huron County

Department of Human Services. During that interview, Csehi, with the use of dolls, elicited the following statements from Debra:

"Q. Yeah, belly button, What are those?

"A. (Indicating.)

"Q. Okay. Yes. Okay.

"A. My daddy and my pants down and this.

"Q. What happened?

"A. My dad pulled me down. I sore, inside and slip and my pants down. Me sore. Daddy.

"Q. Your daddy?

"A. Yes.

"Q. Where were you when this happened?

"A. (inaudible) watch TV and going to fight. I was in bed and (inaudible) sore, in here.

"Q. All right. Let's look at this doll for a minute, okay?

"A. Yeah.

"Q. We'll set this one, over here, for a minute, okay? Can you show me the arms on this one?

"A. This one and leg and eye and mouth.

"Q. Let's see what else. Okay. I think this will undo. Will, it undo, there? There we go. What do you call this?

"A. (inaudible) sore.

"Q. You were telling me something about you and your dad.

"A. Yes.

"Q. Can you tell me, again, with the dolls?

"A. Like this.

"Q. Tell me what happened.

"A. Watch.

"Q. Okay.

"A. Him stand behind his. Daddy like this. Press real hard. Press real hard. Press real hard. Press real hard. Press real hard, all night.

"Q. All night?

"A. All night.

"Q. Where were you, when this happened?

"A. Here's Daddy. Pressed hard.

"Q. What town were you in, when that happened?

"A. New London.

"Q. Where were you, in New London?

"A. Upstairs, me and my daddy.

"Q. Upstairs?

"A. Yeah, and fight and bed. Press down me. Press real hard this. Press real hard. Push.

"Q. Did your daddy say anything?

"A. Yes. Sore in here. Here's daddy. Push, push, push, push, push.

"Q. Did Daddy say anything when he was pushing?

"A. No.

"Q. Did you say anything to Daddy?

"A. Yes.

"Q. What did you say?

"A. Stop.

"Q. What did Daddy say?

"A. No.

"Q. Did Daddy say anything else?

"A. Yes.

"Q. What?

"A. (inaudible) spank me.

"Q. Tell me, again.

"A. (inaudible) he will spank me.

"Q. Did anything come out of Daddy?

"A. Yes.

"Q. Can you tell me about that?

"A. Here's Daddy. Push in. Push real hard, all night, and (inaudible) push hard, push.

"Q. How many times did Daddy do this?

"A. One time, two times, four times.

"A. Four times?

"A. One time, one, two, three, four.

"Q. How many nights did Daddy do this?

"A. One time.

"Q. One night?

"A. Yes.

" * * *

"Q. Go ahead. Okay. Where, in the house, were you and Daddy?

"A. Upstairs (inaudible) fight and (inaudible) house. Push real hard and sore. Push in. Push in.

"Q. Did you have any clothes on when that happened?

"A. My pants.

"Q. Were your pants on or off when Daddy pushed?

"A. Yes.

"Q. On or off?

"A. Off.

"Q. Did Daddy have any clothes on?

"A. Yeah. Pants. No. Them. Pants zip, zip.

"Q. He zipped them?

"A. Yes." (Taken from transcript of videotape interview conducted by Judith Csehi with Debra Hunt, March 10, 1988, pages 3–7.)

On April 15, 1988, appellee was indicted on one count of sexual battery in violation of R.C. 2907.03(A)(5). He pled not guilty, trial was set for July 18, 1988, and he was released on his own recognizance. Thereafter discovery was conducted pursuant to Crim.R. 16. On May 31, 1988, appellee filed a motion *in limine* to prevent the state from using the videotaped interview of Debra, and the drawings by Debra at trial. The motion was later expanded to include the statements made to Marjorie Ours and Clarice Henry–Parham. Appellant also requested the court to determine the competency of Debra as a witness. On June 27, 1988, a hearing was held and testimony taken. The trial court found Debra was incompetent to testify herself, that the statements in question constituted inadmissible hearsay and that they could only be received into evidence if they fell within the excited utterance exception to the hearsay rule. The trial court found further that the "indicia necessary to allow the statements made on videotape and to Clarice Henry into evidence as excited utterances is lacking" and granted appellee's motion *in limine* in part.

From this determination appellant filed this appeal, asserting that the trial court erred in not admitting the videotaped interview into evidence as an excited utterance. Four arguments are raised by appellant's assignment of error: (1) whether or not the application of the excited utterance rule violates appellee's constitutional right of confrontation; (2) whether or not the incom-

petency of Debra as a witness precludes admission of her declarations as excited utterances; (3) whether or not the presence of non-leading questions prior to the declaration precludes the admission of the same as excited utterances; and (4) whether Debra's declaration qualifies as excited utterances even though they were not contemporaneous with the sexual assault. The latter two issues will be considered together first.

Evid.R. 803 provides, in pertinent part:

"Hearsay Exceptions; Availability of Declarant Immaterial.

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

" * * *

"2. Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

In *State v. Wallace* (1988), 37 Ohio St.3d 87, 89, 524 N.E.2d 466, 468, the Supreme Court of Ohio set forth the four-part test to be applied in determining what constitutes an excited utterance:

"The excited-utterance exception is essentially a codification of Ohio common law governing spontaneous exclamations. At common law, this court applied a four-part test in determining what constituted a spontaneous exclamation:

" '(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,

" '(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declaration the unreflective and sincere expression of his actual impressions and beliefs,

" '(c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and

" '(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration' *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus (followed and approved in *State v. Duncan* [1978], 53 Ohio St.2d 215, 7 O.O.3d 380, 373 N.E.2d 1234, paragraph one of the syllabus)." (Footnote omitted.)

It is apparent from the record that the first, third and fourth requirements have been met. The second requirement, and that which was at issue before the trial court, is whether the nervous excitement produced by the assault continued to dominate Debra's reflective faculties up to and through the time of the videotaped interview sixteen days later, so as to render her statements therein spontaneous and unreflective. In determining that issue, the trial court is to be accorded wide discretion, and if its determination was reasonable, it shall not be disturbed even if this court would have decided differently. *Potter v. Baker, supra; State v. Duncan, supra.*

■ The admissibility of statements as excited utterances is to be determined by the individual circumstances of each case. There is no strict rule as to the time frame between the startling event and the declaration, the focus of inquiry being rather whether the declarant was still under the influence of the startling event to such an extent that the statement could not have been the product of reflective thought. *State v. Wallace, supra; State v. Wagner* (1986), 30 Ohio App.3d 261, 30 OBR 458, 508 N.E.2d 164.

■ The declarant in this case being a mentally retarded twenty-five-year-old creates a unique setting for application of the excited utterance exception to the hearsay rule. Ordinarily, for adults, the inquiry would be as to the declarant's emotional condition from the time of the exciting cause up to and through the time of the declaration. *State v. Wallace, supra.* In cases involving young children who are victims of sexual abuse, however, the trend has been to liberalize those requirements to include consideration of the limited reflective abilities of the child and the fact that the undeveloped capability for speech often prohibits the communication until a much later time through the use of dolls or other aids. *State v. Wagner, supra.* In this case, the declarant being chronologically twenty-five-years old, but mentally a young child, both areas of inquiry are clearly appropriate.

As to Debra's emotional condition from the time of the assault through the videotaped interview sixteen days later, the following evidence was presented:

(1) The testimony of Marjorie Ours that on the day of the assault Debra spent the evening at her home playing with Marjorie's children and watching television, but when Marjorie questioned her as to what occurred earlier that day Debra became excited and began crying and shaking.

(2) The testimony of counselor Parham, who interviewed Debra six days later, that Debra appeared nervous initially but Parham attributed that to Debra not knowing her, and that she later calmed down until the point in the interview when she began to describe the abuse, at which time she became more talkative, excited and tearful.

(3) The testimony of Judith Csehi who conducted the videotaped interview sixteen days later that Debra initially appeared excited and tearful and became more so when describing the assault.

(4) The videotape itself which indicates that Debra appears to be calm initially until she began to describe the assault whereupon she became more talkative, somewhat agitated and tearful.

As to Debra's mental capabilities and ability for creative and reflective thought, the only evidence that was presented was the opinion of Judith Csehi that Debra functioned at a five- or six-year-old level, was mildly to moderately retarded and was trainable and educatable. There was no expert testimony as to Debra's specific mental ability and what impact that mental ability would have on her capacity for reflection, or the likelihood that the excitement caused by the assault would totally dominate her capacity for reflection and contemplation of the occurrence for up to several weeks after the incident.

Upon consideration of the evidence that was before the trial court as to Debra's mental capacity and emotion condition we find that the trial court did not abuse its discretion in granting appellee's motion *in limine* as to the videotape evidence. Accordingly, appellant's sole assignment of error is found not well taken. Because we have found the videotaped interview inadmissible, appellant's remaining argument in support of its assignment of error is rendered moot.

Having found no error in the proceedings below, the judgment of the Huron County Court of Common Pleas is affirmed. This cause is remanded to said court for further proceedings not inconsistent with this decision. It is ordered that appellant pay this costs of this appeal.

*Judgment affirmed.*

HANDWORK, P.J., and GLASSER, J., concur.