DECISION AND JUDGMENT ENTRY
{¶ 1} This is a consolidated appeal from various Washington County Common Pleas Court judgments regarding the conviction of William Schofield, defendant below and appellant herein, on the charge of domestic violence in violation of R.C. 2919.25(A). The following errors are assigned for our review in Case No. 01CA36:
FIRST ASSIGNMENT OF ERROR:
 {¶ 2} "THE TRIAL COURT ERRED BY ADMITTING HEARSAY TESTIMONY IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION."
SECOND ASSIGNMENT OF ERROR:
 {¶ 3} "THE TRIAL COURT ERRONEOUSLY DEPRIVED WILLIAM SCHOFIELD OF HIS RIGHT TO CONFRONT WITNESSES IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION."
THIRD ASSIGNMENT OF ERROR:
 {¶ 4} "WILLIAM SCHOFIELD RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
 {¶ 5} Appellant posits the following assignment of error in Case No. 02CA13:
 {¶ 6} "THE TRIAL COURT ERRED IN DENYING WILLIAM SCHOFIELD'S MOTION FOR NEW TRIAL IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."
 {¶ 7} A brief summary of the facts pertinent to this appeal is as follows. Sherry and Randy Schofield married in 1985 and had two children, Randall and Jessica.[2] In 1994, Sherry Schofield became romantically involved with her husband's brother, William Schofield, appellant herein. Subsequently, Sherry Schofield and William Schofield had a child, Ashley Schofield.[3] Sherry and Randy Schofield eventually divorced in 1995.
¶ 8On October 16, 2000, Sherry Schofield, the two Schofield brothers and their respective children resided in a house trailer on Main Street in Vincent, Ohio. Around 9 PM that evening, Sherry Schofield began to prepare to go to work. Because appellant had been out driving that day, Sherry Schofield asked him for gas money. This led to an altercation which resulted in appellant punching Sherry Schofield in the face. Sherry Schofield screamed and the other members of the household came to her defense. Her ex-husband fought appellant while Jessica grabbed a broken furnace door and swung it at appellant (her uncle). Sherry Schofield then left the trailer. Appellant followed Sherry and struck her again, this time in the arm and shoulder area. Once again, Randy Schofield came to his ex-wife's defense and the two brothers wrestled on the ground. Eventually, sheriff's deputies arrived and appellant fled into the neighborhood.
 {¶ 9} The Washington County Grand Jury returned an indictment charging appellant with domestic violence in violation of R.C.2919.25(A).[4] He pled not guilty and the matter came on for a jury trial over several days in September, 2001.
 {¶ 10} At trial, Sherry Schofield testified that while she was in the house trailer's bathroom appellant struck her once in the face. She further testified that she was outside the residence when appellant struck her in the arm and shoulder area. Although no other witnesses actually viewed the events that occurred in the bathroom, several witnesses confirmed the gist of her story. Randall Schofield testified he heard a "smack" in the bathroom, followed almost immediately by Sherry Schofield screaming and crashing into a wall. Randall Schofield also testified that he saw his brother strike Sherry when they were outside the residence and that the following day Sherry had bruises. Sherry Schofield's children, Randall and Jessica, both testified they heard the argument in the bathroom, then a "bang" or "thump" and their mother screaming.[5]
 {¶ 11} The defense did not present evidence to refute these accounts, but did call Curt Husk, the Schofields's next-door neighbor. Husk testified that Sherry had a reputation for embellishing the truth or making things "bigger than what they are." Husk also stated that he did not see appellant strike Sherry and that he did not see bruises the next day.
 {¶ 12} After hearing the evidence, the jury returned a guilty verdict.[6] On October 19, 2001, appellant filed a motion for a new trial and appellant claimed that (1) a juror had been permitted to ask a question, (2) the trial court judge and the prosecutor had conflicts of interest, (3) witnesses illegally discussed testimony during the trial and (4) the defense was prohibited from introducing evidence as to the credibility of the alleged victim. The prosecution argued that the court should deny the motion because (1) it was filed out of rule and, (2) it had no merit. At the November 1, 2001 motion hearing, the defense called three witnesses. Those witnesses testified in support of the defense allegations. Subsequently, the trial court overruled the motion, both for being filed out of rule and for lack of merit.
 {¶ 13} The trial court then imposed a seven month prison sentence. The court entered judgment on November 7, 2001. Appellant filed his notice of appeal in Case No. 01CA36 from that judgment. On March 18, 2002, the trial court issued a judgment that formally overruled appellant's motion for a new trial. Appellant filed his notice of appeal in Case No. 02CA13 from that judgment. On April 25, 2002, this Court ordered that the two cases be consolidated for purposes of oral argument and decision. The matters is now before us for review.[7]
 I {¶ 14} In his first assignment of error, appellant asserts that the trial court erred by admitting into evidence inadmissible hearsay. We disagree.
 {¶ 15} Curt Husk, the sole defense witness, lives next to the Schofield residence. Husk testified on direct examination that he heard the commotion next door, but that he did not see appellant strike Sherry Schofield. On cross-examination, Husk testified as follows:
 {¶ 16} "Q. And Jessica was pretty terrified, when she came in to use the phone. Correct?
 {¶ 17} "A. Yeah. She — she wasn't crying. She was — well, she may have been. I don't re — I don't recall that.
 {¶ 18} "Q. And you didn't go to look, to see what she was so terrified about, right away? A little, terrified ten-year-old came to your house, screaming, and asking to use the phone to call the Sheriff's Office, and you didn't have the inkling to say, `Well, let's see —.'
 {¶ 19} "A. I — I just knew that when she told me that her dad and her uncle were out there fighting again, are out there in the yard, fighting, that that's what it was. They was out there, fighting. No, I didn't run right out there. I didn't really want to go out there and get in the middle of it.
 {¶ 20} "Q. Okay. And so, it's your testimony that you didn't go, look out the window, and say, `Oh, my gosh, your — Bill just hit your mom'?
 {¶ 21} "A. No. Absolutely not.
 {¶ 22} "Q. And that's not that you can't recollect, you're testifying that you can't — that didn't happen.
 {¶ 23} "A. No. My wife would tell you the same thing.
 {¶ 24} "Q. Do you know a Jody Schofield?
 {¶ 25} "A. Just, I met her probably a month or two after this had happened.
 {¶ 26} "Q. Okay. And then, did you have a conversation with Jody Schofield in regard to this incident?
 {¶ 27} "A. No. They had a conversation. I listened.
 {¶ 28} "Q. So, did you, during that conversation, I guess, where you're saying you're just listening, now, did you tell Jody Schofield that you witnessed Bill Schofield hit Sherry Schofield out in the yard?
 {¶ 29} "A. No, no.
A. That's not true?
 {¶ 30} "A. No. Absolutely no. Absolutely not.
 {¶ 31} "Q. And just so I'm —
 {¶ 32} "A. I have never seen Bill hit Sherry. So, I don't — so, I know, if I had seen him one time, I would know. I've just never seen that.
 {¶ 33} "Q. And just so I'm clear, you're better friends with Bill than you are with Sherry. Is that correct?"
 {¶ 34} Husk's testimony apparently varied with Jessica's version of the facts. On direct examination, Jessica testified as follows:
 {¶ 35} "And I said, `Can I use the phone? My dad and my mom and Bill is in a fight.'
 {¶ 36} "And then, I was up there, on the — using the phone, and she said, `What's the number?' She dialed the number. Then I got on the phone with the police.
 {¶ 37} "And I heard my mom and Bill yelling, and I — Curt was on the chair, looking out the window. And he said, `Oh my god, your mom just — Bill just hit your mom.'
 {¶ 38} "MR. SMITH: Object. Hearsay. Move to strike, Judge. That's hearsay.
 {¶ 39} "MR. KERENYI: I believe it would be present sense impression.
 {¶ 40} "THE COURT: Pardon?
 {¶ 41} "MR. KERENYI: I believe it would be present sense impression.
 {¶ 42} "THE COURT: It's what he said, right?
 {¶ 43} "MR. SMITH: Yes.
 {¶ 44} "MR. KERENYI: Right.
 {¶ 45} "THE COURT: It's — it's sustain the objection.[8]
 {¶ 46} "MR. SMITH: Thank you.
 {¶ 47} "MR. KERENYI: Okay.
 {¶ 48} "THE COURT: You disregard that, okay? Thanks.
 {¶ 49} "BY MR. KERENYI: (Resuming):
 {¶ 50} "A. And then, when I said that, then Mom come in the house, and she got on the phone with the police.
 {¶ 51} "And they kept on saying, `What happened? Was there any weapons involved?'
 {¶ 52} "And I said, `Yeah.'
 {¶ 53} "And they said, `What one?'
 {¶ 54} And Bill had pulled a knife on my dad, in the living room. And that — he was in the kitchen, and he pulled a knife, and he said, `You're going to prison.'
 {¶ 55} "And my dad said, `If I go to prison, you're going to go to prison with me.'
 {¶ 56} "Q. And then, so you — basically, you talked with the dispatcher at — at — at the Sheriff's Office. Is that correct?
 {¶ 57} "A. Yes."
 {¶ 58} After the appellant rested, Jessica testified as a prosecution rebuttal witness as follows:
 {¶ 59} "Q. Jessica, I'm just going to ask you a couple of follow-up questions about what we talked about before, okay? When you were inside Curt Husk's house, using the telephone, do you remember that?
 {¶ 60} "A. Yeah.
 {¶ 61} "Q. Okay. Did — did he look out the window and make a statement, about what he saw?
 {¶ 62} "A. Yes.
 {¶ 63} "Q. What did he say?
 {¶ 64} "A. He said, `Oh, my gosh, Bill just hit your mom.'[9]
 {¶ 65} "MR. KERENYI: Okay. Thank you. Nothing further.
 {¶ 66} "THE COURT: Okay. Attorney Smith.
 {¶ 67} "CROSS EXAMINATION
 {¶ 68} "BY MR. SMITH:
 {¶ 69} "Q. Who'd you tell that to?
 {¶ 70} "A. What do you mean?
 {¶ 71} "Q. How do we know that's what happened? Did you make a written statement that night?
 {¶ 72} "A. Yes, I did. I —
 {¶ 73} "Q. You made a written statement that night?
 {¶ 74} "A. I'm pretty sure I did. I can't quite remember, but I'm pretty sure.
 {¶ 75} "MR. SMITH: May we approach?
 {¶ 76} "THE COURT: You may.
 {¶ 77} "BY MR. SMITH (Resuming):
 {¶ 78} "A. Because, like, when he come over, a couple days afterthat, and he said, `I heard every — I saw Bill hit you.'
 {¶ 79} "And Mom said, `You saw everything?'
 {¶ 80} "And he said, `Yes. I saw everything.'
 {¶ 81} "MR. SMITH: Can we approach, Judge?
 {¶ 82} "THE COURT: Yeah. Okay. Just a second, Jessica.
 {¶ 83} "MR. SMITH: Do you have it?
 {¶ 84} "MR. KERENYI: No.
 {¶ 85} "THE COURT : So you — is there no written statement in your file?
 {¶ 86} "MR. KERENYI: I — I don't have one from her in my file.
 {¶ 87} "THE COURT: Okay. So, that's — can we stipulate to that?
 {¶ 88} "MR. SMITH: I can. I just —
 {¶ 89} "THE COURT: You can still approach.
 {¶ 90} "MR. SMITH: — and I never received one, and I don't —
 {¶ 91} "THE COURT: Is that what you wanted, Attorney Smith?
 {¶ 92} "MR. SMITH: Yeah.
 {¶ 93} "MR. KERENYI: I can't, because I —
 {¶ 94} "MR. SMITH: She's saying she has a
 {¶ 95} "* * *
 {¶ 96} "REDIRECT EXAMINATION
 {¶ 97} "By MR. KERENYI:
 {¶ 98} "Q. Based on the follow-up questions of what he asked, Jessica, is it also my understanding that Curt Husk had a conversationwith your mother, Sherry, later on?
 {¶ 99} "A. Yes.
 {¶ 100} "Q. And did Curt Husk make statements, again there, inregard to seeing or not seeing Sherry get hit?
 {¶ 101} "A. Yes.
 {¶ 102} "MR. SMITH: I'll object. That's hearsay. That was never asked by Mr. Husk.
 {¶ 103} "THE COURT: Mr. Husk was here, and he was —
 {¶ 104} "MR. SMITH: But he was never asked that particular question, so he didn't get a chance to rebut it or not rebut it at that time Judge.
 {¶ 105} "THE COURT: Yeah. And you chose to release him from his subpoena. It's not hearsay at this point. You may answer the question, Jessica.
 {¶ 106} "BY MR. KERENYI (Resuming):
 {¶ 107} "A. Okay. He — he come over, and he said, `I heardit.' And a couple days after that, him and Bill got, like, friends, andhe said, `I didn't say anything. I didn't say anything. I didn't seeit.'
 {¶ 108} And before that, he said it.
 {¶ 109} "Q. He said he did see it?
 {¶ 110} "A. And then he changed his mind.
 {¶ 111} "Q. Okay. To — to your knowledge, is he friends with Bill Schofield?
 {¶ 112} "A. Yes.
 {¶ 113} "Q. Okay. Do you see them together a lot?
 {¶ 114} "A. Well, I've like — yeah. I saw them together.
 {¶ 115} "Q. Okay.
 {¶ 116} "MR. KERENYI: All right. Thank you. Nothing further." (Emphasis added)
 {¶ 117} Another prosecution rebuttal witness, Jody Schofield, who at the time of the trial resided with the victim (Sherry Schofield), testified as follows:
 {¶ 118} "Q. Okay. Do you know a, a Curt Husk?
 {¶ 119} "A. Yes, I do.
 {¶ 120} "Q. How do you know Curt Husk?
 {¶ 121} "A. He was Sherry's neighbor for some time.
 {¶ 122} "Q. Okay. Did you ever overhear a conversation, whereCurt Husk was talking about whether or not he saw a confrontationbetween Bill Schofield and Sherry Schofield?
 {¶ 123} "A. Yes, I did.
 {¶ 124} "Q. Where did that conversation occur?
 {¶ 125} "A. In Sherry's living room.
 {¶ 126} "Q. Okay. And what, if anything, did Mr. Husk say aboutwhether or not he saw it?
 {¶ 127} "A. He said he saw everything, from Randy and Billfighting, to Bill hit Sherry.
 {¶ 128} "Q. Okay. He — he said that he saw Bill hit Sherry?
 {¶ 129} "A. Yes." (Emphasis added)
 {¶ 130} Thus, both Jessica's and Jody's rebuttal testimony concerning Husk's prior statement contradicted Husk's trial testimony (that he did not state to Sherry Schofield in a conversation that occurred some time after the domestic violence incident that he witnessed appellant strike Sherry). Jody Schofield testified that Husk stated that he "saw everything," including appellant strike Sherry. Jessica testified that Husk stated that he "heard it," regarding the domestic violence incident.
 {¶ 131} Appellant contends that the rebuttal testimony elicited from Jessica and Jody Schofield constitutes inadmissible hearsay. Appellant notes that both witnesses attributed an out-of-court statement by Husk that (1) allegedly occurred months after the domestic violence incident; and (2) was used to establish the truth of the matter asserted (i.e. that appellant committed domestic violence against Sherry Schofield). Appellant further contends that no exception applies to permit the trier of fact to consider the statements, and that a reasonable probability exists that this particular evidence might have contributed to appellant's conviction.
 {¶ 132} Appellee first notes that the trial court permitted the testimony because Husk had already testified and the testimony "was no longer hearsay." Appellee contends, however, that "regardless of whether this [the trial court's decision] was error,"[10] the "admission of collateral evidence of these statements is permitted under Evid.R. 613 because the proper foundation was laid." Appellee notes that it asked Husk during his cross-examination if he had stated in a conversation after the incident that he had observed appellant strike Sherry Schofield and that Husk denied making any such statement. Thus, appellee asserts that the rebuttal testimony properly contradicted Husk's trial testimony with a prior inconsistent statement. Appellant contends, however, that although Evid.R. 613 "provides limited opportunities for a witness to be impeached with an out-of-court statement * * * where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."
 {¶ 133} In State v. Keith (1997), 79 Ohio St.3d 514, 525,684 N.E.2d 47, 59, reconsideration denied 80 Ohio St.3d 1450,686 N.E.2d 276, certiorari denied 118 S.Ct. 1393, 140 L.Ed.2d 602, the Ohio Supreme Court discussed the foundational requirement for the admission of extrinsic evidence of prior inconsistent statements:[11]
 {¶ 134} "Pursuant to Evid.R. 613(B), when extrinsic evidence of a prior inconsistent statement is offered into evidence, a foundation must be established through direct or cross-examination in which (1) the witness is presented with the former statement, (2) the witness is asked whether he made the statement, (3) the witness is given an opportunity to admit, deny, or explain the statement, and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement. Mack, 73 Ohio St.3d at 515, 653 N.E.2d at 339, quoting Statev. Theuring (1988), 46 Ohio App.3d 152, 155, 546 N.E.2d 436, 439."
 {¶ 135} The purposes underlying this foundational requirement are: (1) to avoid unfair surprise to the adversary; (2) to save time, as an admission by the witness may make extrinsic proof unnecessary; and (3) to give the witness in fairness a chance to explain the discrepancy. 1 McCormick, Evidence See 37, at 120 (4th Ed. 1992). If, however, a witness denies making the statement, a proper foundation has been laid, and the evidence does not relate to a collateral matter, extrinsic evidence is admissible. State v. Riggins (1986), 35 Ohio App.3d 1, 519 N.E.2d 397. Thus, courts have permitted extrinsic evidence concerning a witnesses' prior inconsistent statements. See, generally, State v. Walker (1995),101 Ohio App.3d 433, 655 N.E.2d 823; State v. Baker (2000),137 Ohio App.3d 628, 739 N.E.2d 819; State v. Lewis (1990),70 Ohio App.3d 624, 591 N.E.2d 854.
 {¶ 136} In the case sub judice, we believe that appellee, the rebuttal testimony's proponent, satisfied the foundational requirement under Evid.R. 613 and, thus, properly adduced impeachment evidence regarding Husk's prior inconsistent statement. During Husk's cross-examination, he flatly denied that he had a conversation with Sherry, Jessica and Jody some time after the event and that he stated that he observed the appellant strike Sherry Schofield. Although this testimony was somewhat cumbersome and confusing, we believe that the trier of fact could attach what weight it deemed appropriate for witness impeachment purposes.
 {¶ 137} Furthermore, assuming arguendo that the trial court improperly admitted the rebuttal testimony concerning Husk's prior inconsistent statement into evidence, we believe that this error would not constitute reversible error.
 {¶ 138} Reversible error cannot be predicated on an erroneous evidentiary ruling unless that error affected a substantial right. See Evid.R. 103(A). Errors that do not affect substantial rights must be disregarded. Crim.R. 52(A). Appellate courts shall not reverse judgments for an erroneous evidentiary ruling unless it appears that the defendant's rights have been prejudiced. State v. Woolum (Mar. 5, 1996), Ross App. No. 95CA2083.
 {¶ 139} In the case sub judice, we conclude that if the trial court erroneously admitted into evidence the rebuttal testimony, the evidence was non-prejudicial and harmless. First, Husk's testimony was, at best, only marginally exculpatory. He did not testify that appellant did not strike Sherry. Rather, Husk stated that he did not see appellant strike Sherry. Second, we note that Husk would have only been in a position to see appellant strike Sherry while they were positioned outside the residence. Husk could not see into the Schofield trailer residence and, thus, he could not comment on events that occurred indoors. Finally, we cannot say that a reasonable probability exists that this evidence contributed to appellant's conviction. Ample evidence was adduced at trial, including Sherry Schofield's testimony, appellant's brother's testimony and testimony from appellant's niece and nephew to establish that appellant committed domestic violence.
 {¶ 140} Therefore, based upon the reasons stated above, we find that the admission of the rebuttal testimony into evidence was, if error, harmless error. Accordingly, we hereby overrule appellant's first assignment of error.
 II {¶ 141} Appellant's second assignment of error is directed at an affidavit executed by Sherry Schofield. That affidavit states in pertinent part:
 {¶ 142} "1. I am the victim in this case which was [i]ndicted by the Washington County Grand Jury on December 13, 2000, on a charge of [d]omestic [v]iolence, a violation of Ohio Revised Code section 2919.25(A), a fifth degree felony, for which a [j]ury [t]rial is presently scheduled on March 22, 2001.
 {¶ 143} "* * *
 {¶ 144} "3. The [d]efendant William L. Schofield is accused of having caused me physical harm at my home on October 16, 2000.
 {¶ 145} "4. I specifically agree and consent that the Washington County Prosecuting Attorney may dismiss this case, and NOT present it to a Jury Trial, and/or permit William L. Schofield to plead guilty to a first degree misdemeanor charge of [d]omestic [v]iolence, a violation of Ohio Revised Code section 2919.25(A), in Marietta Municipal Court.
 {¶ 146} "* * *
 {¶ 147} "7. It is my decision alone, as the victim, to ask the Washington County Prosecuting Attorney to negotiate a plea bargain in this case and/or to dismiss the indictment, as set forth, herein above. * * *"
 {¶ 148} The defense wanted to question Sherry Schofield regarding this affidavit. The trial court, however, prohibited them from doing so. Appellant argues that the trial court's decision denied him his constitutional right to confront witnesses. We disagree.
 {¶ 149} Both the Sixth Amendment to the United States Constitution and Section 10, Article I, of the Ohio Constitution guarantee criminal defendants the right to confront witnesses at trial. Implicit in those guarantees is the right to cross-examine adverse witnesses. See generally State v. Williams (1983), 4 Ohio St.3d 74, 75,446 N.E.2d 779; State v. Miller (1975), 42 Ohio St.2d 102, 104,326 N.E.2d 259. A defendant's right to confront and cross-examine a witness is not unlimited, however. Delaware v. Van Arsdall (1986),475 U.S. 673, 679, 89 L.Ed.2d 674, 106 S.Ct. 1431. Trial courts retain latitude to impose reasonable limits on cross-examination based on concerns of, inter alia, harassment, prejudice, confusion of the issues, witness' safety, or interrogation that is repetitive or only marginally relevant. Id. Thus, the Confrontation Clause guarantees the opportunity for effective cross-examination, not cross-examination in whatever way, and to whatever extent, the defense might wish. Id., citing Delaware v. Fensterer
(1985), 474 U.S. 15, 20, 88 L.Ed.2d 15, 106 S.Ct. 292. Furthermore, the right to cross-examine adverse witnesses does not authorize defense counsel to disregard sound evidentiary rules. State v. Amburgey (1987),33 Ohio St.3d 115, 117, 515 N.E.2d 925; State v. Norwood (Mar. 22, 2002), Lake App. No. 2000-L-146; State v. Minier (Sep. 28, 2001), Portage App. No. 2000-P-25.
 {¶ 150} While cross-examination is a matter of constitutional right, the extent of cross-examination with respect to an appropriate subject of inquiry is within a trial court's sound discretion. State v.Green (1993), 66 Ohio St.3d 141, 147, 609 N.E.2d 1253, citing Alford v.United States (1931), 282 U.S. 687, 691, 75 L.Ed. 624, 51 S.Ct. 218. Moreover, the admission or the exclusion of relevant evidence is left to a trial court's sound discretion. See State v. Dunlap (1995),73 Ohio St.3d 308, 316, 652 N.E.2d 988; State v. Sage (1987),31 Ohio St.3d 173, 510 N.E.2d 343, at paragraph two of the syllabus. Thus, a court's decisions regarding scope of cross-examination, and the admission or exclusion of relevant evidence, will not be reversed absent an abuse of discretion. We note that an abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, l1 arbitrary or unconscionable. State v. Herring (2002),94 Ohio St.3d 246, 255, 762 N.E.2d 940; State v. Clark (1994),71 Ohio St.3d 466, 470, 644 N.E.2d 331; State v. Adams (1980),60 Ohio St.2d 151, 157, 404 N.E.2d 144. Moreover, an abuse of discretion means that the result is so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but, instead, passion or bias. Nakoff v. FairviewGen. Hosp. (1996), 75 Ohio St.3d 254, 256, 662 N.E.2d 1. Appellate courts are cautioned that they should not merely substitute their own judgment on matters that involve a trial court's exercise of discretion. State exrel. Duncan v. Chippewa Twp. Trustees (1995), 73 Ohio St.3d 728, 732,654 N.E.2d 1254; In re Jane Doe 1 (1991). 57 Ohio St.3d 135, 137-138,566 N.E.2d 1181; Berk v. Matthews (1990), 53 Ohio St.3d 161, 169,559 N.E.2d 1301.
 {¶ 151} In the instant case, we note that Sherry Schofield's affidavit did not contradict her trial testimony. Moreover, nothing appears in the affidavit that is in any way exculpatory to appellant. Schofield does not state that appellant did not strike her and she does not recant her statements. To the contrary, at one point Sherry Schofield states that she would consent to appellant pleading guilty to misdemeanor domestic violence in Municipal Court. This information appears to bolster her trial testimony that appellant, in fact, perpetrated domestic violence. Thus, we find that appellant did not suffer prejudice by the trial court's exclusion of any reference to this affidavit.
 {¶ 152} We also agree with the trial court that the gist of this affidavit is an acknowledgement that the prosecution may dispose of the case in the manner it sees fit. Appellant appears to argue that the victim's willingness to permit the prosecution to dispose of this case in a manner it chooses somehow evidences the victim's lack of interest or desire in the outcome of the case. Of course, the prosecution is vested with the authority to bring and to prosecute criminal cases in the manner it deems appropriate. A violation of criminal law is an offense against the State of Ohio. Stebelton v. Haskins (1964), 177 Ohio St. 52, 54,201 N.E.2d 884. Any resulting prosecution is brought on behalf of the state, not the victim. Breaker v. State (1921), 103 Ohio St. 670, 671,134 N.E.2d 479. The victim of a crime is not a party who can halt a prosecution whenever she so desires. See State v. Wright (Jul. 29, 1994), Scioto App. No. 93CA2110; State v. McClain (Mar. 31, 1994), Vinton App. No. 482 (Stephenson, J. Concurring). This is particularly true in domestic violence cases when it is not unusual for victims to attempt to persuade the prosecution to dismiss cases. See Lakewood v. Pfeifer
(1991), 61 Ohio Misc.2d 704, 710-711, 583 N.E.2d 1133. That said, we believe that the affidavit in the case sub judice had no bearing on the prosecution of this case. Its admission would serve no purpose other than to confuse the issues or to mislead the jury. See Evid.R. 403(A).
 {¶ 153} Appellant counters by citing Chillicothe v. Woodfork
(Dec. 6, 1990), Ross App. No. 1593, wherein this court reversed an assault conviction because the trial court impermissibly restricted the defense from cross-examining the alleged victim regarding a prior statement given to police. That case is distinguishable from the case sub judice for several reasons. In Woodfork the alleged victim made additional criminal accusations against the defendant which were not prosecuted. The fact that the defendant was not charged with other alleged crimes arguably went to the veracity of the victim's testimony regarding the crime that was prosecuted. In this case, however, no other accusations are involved and we find nothing in the affidavit to contradict Sherry Schofield's trial testimony. In addition, in Woodfork, the sole evidence that a crime had been committed and the perpetrator's identity turned solely on the victim's testimony. This fact made the victim's veracity particularly important. In the instant case, however, testimony from Randy Schofield and both Randall and Jessica Schofield establish that appellant perpetrated the domestic violence crime against Sherry Schofield.
 {¶ 154} For these reasons, we find no error or abuse of discretion in the trial court's decision to prohibit cross-examination regarding this affidavit. Accordingly, we hereby overrule appellant's second assignment of error.
 III {¶ 155} Appellant argues in his third assignment of error that his counsel made several mistakes at trial and those mistakes denied him constitutionally effective representation. We are not persuaded.
 {¶ 156} Our analysis begins from the premise that criminal defendants have the right to assistance of counsel, which includes the right to effective assistance of counsel. McCann v. Richardson (1970),397 U.S. 759, 770, 25 L.Ed.2d 763, 90 S.Ct. 1441; State v. Lytle (Mar. 10, 1997), Ross App. No. 96CA2182; State v. Doles (Sep. 18, 1991), Ross App. No. 1660. In order to obtain the reversal of a conviction on the grounds of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient, and (2) such deficient performance prejudiced the defense so as to deprive him of a fair trial. See Strickland v. Washington (1984), 466 U.S. 668, 687, 80 L.Ed.2d 674,104 S.Ct. 2052; also see State v. Issa (2001), 93 Ohio St.3d 49, 67,752 N.E.2d 904; State v. Goff (1998), 82 Ohio St.3d 123, 139,694 N.E.2d 916. We note that both prongs of this test need not be analyzed if his claim can be resolved under only one of them. See Statev. Madrigal (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52. Thus, if a claim can be resolved on the lack of prejudice prong, that course should be followed. See State v. Loza (1994), 71 Ohio St.3d 61, 83,641 N.E.2d 1082. With this in mind, we turn our attention to the instances of alleged ineffectiveness raised by appellant in his brief.
 {¶ 157} The first claim of deficient performance concerns testimony by several witnesses about the fight between appellant and his brother, Randy Schofield. Appellant argues that this testimony was both irrelevant and concerned "prior bad acts" which should have been excluded pursuant to Evid.R. 404(B). He thus asserts that his attorney's failure to object to that testimony deprived him of the effective assistance of counsel. We disagree.
 {¶ 158} First, we note that several of the transcript pages appellant cites do not contain any evidence regarding a fight between the Schofield brothers. Second, the pages on which that testimony does appear includes Randy Schofield coming to Sherry Schofield's aid to defend her from appellant. This was not character evidence, as prohibited by Evid.R. 404(B), but was part of the narrative of the events that occurred that evening. Furthermore, at several points during the trial court proceedings, appellant suggested that his brother should have been charged with some crime for attacking him. The evidence of the fracas was legitimate evidence for the jury to consider.
 {¶ 159} Appellant also asserts that counsel was deficient because he withdrew a request for a jury view. The basis for this argument stems from Randy Schofield testifying that he saw his brother strike Sherry when they were positioned outside the trailer. Sherry testified earlier that she was in Curt Husk's yard when appellant struck her the second time. At the hearing on his motion for new trial, appellant testified that a six foot privacy fence runs between the two residences and that "[t]here's no way anyone could have been sitting in that trailer, and seen anything out the front door of that trailer." Given his own testimony, appellant concludes that trial counsel's decision to withdraw the jury view request constitutes ineffective performance because the view would have arguably contradicted his brother's story. We are not persuaded.
 {¶ 160} Assuming arguendo that the fence does exist and may have impeded Randy Schofield's view, we note that impeachment of witness credibility is not the proper use of a jury view. State v. Smith (1993),90 Ohio App.3d 177, 180, 628 N.E.2d 120; State v. Evans (Dec. 31, 1985), Hamilton App. No. C-850042. A view of the crime scene is not evidence.State v. Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 70; State v. Richey (1992), 64 Ohio St.3d 353, 367, 595 N.E.2d 915. As noted by the First District Court of Appeals, "[t]he danger of using a view of the premises as direct evidence is obvious; there are too many opportunities for chicanery (and temptations to engage in such deception) to permit that evidentiary use of the view of the premises." Evans, supra. Moreover, even if the jury had viewed the fence, we do not believe that this factor would have resulted in an acquittal. Ample evidence established appellant's guilt. Sherry Schofield testified that appellant struck her twice. Randy Schofield and the Schofield children also testified that they heard a "smack" or "thump" from the bathroom and then heard Sherry scream. In short, we do not believe that trial counsel's decision to withdraw the jury view prejudiced appellant or denied him a fair trial.
 {¶ 161} Finally, appellant claims that trial counsel should have obtained through discovery a written statement that was "purportedly" given by Jessica Schofield to police.[12] Appellant contends that the production of this statement under Crim.R. 16 was necessary for adequate cross-examination in order to delve into any potential inconsistencies between Jessica's trial testimony and her alleged written statement. Appellee asserts that appellant cannot establish that such a written statement even exists, and, if so, how this alleged statement would have affected the jury's verdict.
 {¶ 162} First, we find nothing in the record to indicate that such a written statement does, in fact, exist. If we assume for purposes of argument that the statement does exist, the record reveals that the prosecution did not have the statement. The trial transcript reveals the following colloquy between Jessica, the court and counsel:
 {¶ 163} "Q. How do we know that's what happened? Did you make a written statement that night?
 {¶ 164} "A. Yes, I did. I —
 {¶ 165} "Q. You made a written statement that night?
 {¶ 166} "A. I'm pretty sure I did. I can't quite remember, but I'm pretty sure.
 {¶ 167} "* * *
 {¶ 168} "[DEFENSE COUNSEL] Can we approach, Judge?
 {¶ 169} "THE COURT: Yeah. Okay. Just a second, Jessica.
 {¶ 170} "[DEFENSE COUNSEL] Do you have it?
 {¶ 171} "[PROSECUTOR] No.
 {¶ 172} "THE COURT: So you — is there no written statement in your file?
 {¶ 173} "[PROSECUTOR] I — I don't have one from her in myfile.
 {¶ 174} "THE COURT: Okay. So, that's — can we stipulate to that?
 {¶ 175} "[DEFENSE COUNSEL] I can. I just —
 {¶ 176} "THE COURT: You can still approach.
 {¶ 177} "[DEFENSE COUNSEL] — and I never received one, and I don't —
 {¶ 178} "THE COURT: Is that what you wanted [defense counsel]?
 {¶ 179} "[DEFENSE COUNSEL] Yeah.
 {¶ 180} "[PROSECUTOR] I can't, because I —
 {¶ 181} "[DEFENSE COUNSEL] She's saying she has a written statement. This is the first I have learned of this.
 {¶ 182} "[THE COURT] You didn't get one, right?
 {¶ 183} "[DEFENSE COUNSEL] I didn't get one, and I'm —
 {¶ 184} "THE COURT: Okay.
 {¶ 185} "[PROSECUTOR] Your Honor, I don't know if she did or shedidn't. I mean, it's possible. If she did —
 {¶ 186} "THE COURT: But you're willing to stipulate that you don't have one in your file?
 {¶ 187} "[PROSECUTOR] I do not have one in my file." (Emphasis added)
 {¶ 188} From the foregoing exchange, it appears that a written statement may or may not exist. It appears, however, that the prosecution did not have a copy of the alleged statement.
 {¶ 189} The Due Process Clauses found in the Fifth andFourteenth Amendments to the United States Constitution guarantee fundamental fairness in the trial of a criminal defendant. Lisenba v. California
(1941), 314 U.S. 219. The guarantee of a fair trial does not mean an error-free or perfect trial. United States v. Hasting (1983), 461 U.S. 499. Due process does, however, require the prosecution to allow the accused to present a complete defense. California v. Tombetta (1984), 467 U.S. 479. Generally, the prosecution guarantees the accused the right to present a complete defense when it affords him access to evidence. Id.,467 U.S. at 485, quoting United States v. Valenzuela-Bernal (1982), 458 U.S. 858,867.
 {¶ 190} Crim.R. 16(B)(1)(g) permits discovery of witness' statements that are inconsistent with their testimony. The rule provides in pertinent part as follows:
 {¶ 191} "In camera inspection of witness' statement. Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.
 {¶ 192} "If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.
 {¶ 193} "If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.
 {¶ 194} "Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal."
 {¶ 195} If the state fails to disclose discoverable information, Crim.R. 16(E) vests the trial court with broad discretion in fashioning the appropriate remedy. See State v. Scudder (1994), 71 Ohio St.3d 263,268, 643 N.E.2d 524, 529. Specifically, Crim.R. 16(E)(3) provides:
 {¶ 196} "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."
 {¶ 197} In determining whether the prosecution violated the discovery rule, courts should inquire into not only whether the prosecuting attorney knew of the material, but also whether law enforcement officials knew of the material. See State v. Wiles (1991),59 Ohio St.3d 71, 78, 571 N.E.2d 97, 110 (stating that "the police are part of the state and its prosecutorial machinery," and, thus, that a police officer's knowledge of a defendant's statement must be imputed to the state for discovery purposes). To conclude, however, that foreknowledge of the undisclosed material would have benefitted a defendant's case requires more than a "bald assertion" that foreknowledge of a statement would have benefitted the defendant. Id.,59 Ohio St.3d at 79, 571 N.E.2d at 111; see, also, State v. Logan (Sept. 30, 1998), Summit App. No. 18958, unreported (finding speculative and insufficient, under the second prong of Parson, defense counsel's statement that the testimony would have entirely changed the nature of the defense); Statev. Evilsizor (Oct. 19, 1994), Champaign App. No. 93-CA-15, unreported (finding that defendant's "bald, non-specific assertions that his preparation for trial was hampered * * * are insufficient to demonstrate that the trial court committed reversible error").
 {¶ 198} Prejudice warranting a reversal requires the defendant to demonstrate that "the state's failure to comply with Crim.R. 16(B)(1)(a)([i]) prejudiced his ability to reveal a weakness in the state's case or his ability to present a credible defense more effectively." State v. Spirko (1991), 59 Ohio St.3d 1, 9, 570 N.E.2d 229,242, certiorari denied (1991), 502 U.S. 913, 112 S.Ct. 312,116 L.Ed.2d 254. A mere possibility that proper discovery would have altered the outcome of the proceedings is insufficient to demonstrate that the defendant was prejudiced. State v. Today's Bookstore, Inc. (1993),86 Ohio App.3d 810, 821, 621 N.E.2d 1283, 1290, appeal dismissed (1993),66 Ohio St.3d 1522, 614 N.E.2d 1051.
 {¶ 199} In the case sub judice, appellant presents no compelling argument that discovery of Jessica's statement, assuming for purposes of argument that such a statement does indeed exist, would have benefitted his defense. Rather, appellant's argument that knowledge of this information would have benefitted his defense constitutes a "bald assertion" that is insufficient to satisfy Parson. Moreover, appellant has failed to demonstrate that the result of his trial would have been different had the prosecution disclosed the witness statement (again, assuming such a statement does exist). In other words, no reasonable probability exists that the lack of this particular piece of information might have contributed to appellant's conviction. See Chapman v.California (1967), 386 U.S. 18; State v. Madrigal (2000),87 Ohio St.3d 378, 721 N.E.2d 52.
 {¶ 200} Accordingly, based upon the foregoing reasons we hereby overrule appellant's third assignment of error.
 IV {¶ 201} We now turn to the assignment of error posited in Case No. 02CA13. Appellant asserts that the trial court erred by overruling his motion for a new trial. We disagree.
 {¶ 202} Decisions on motions for a new trial are relegated to the sound discretion of the trial court. Thus, those decisions will not be overturned on appeal absent an abuse of that discretion. See State v.LaMar, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 85;State v. Schiebel (1990), 55 Ohio St.3d 71, 544 N.E.2d 54 at paragraph one of the syllabus. In the instant case, we find no abuse of discretion and therefore no error with the trial court's judgment.
 {¶ 203} To begin, motions for new trial must generally be filed within fourteen days after the verdict. Crim.R. 33(B). The jury rendered its verdict in this case on September 19, 2001, and appellant filed the motion for new trial on October 19, 2001. As the trial court noted, the motion was out of rule.
 {¶ 204} Moreover, motions for new trial should not be granted unless it appears that error existed in the proceedings and that the defendant suffered prejudice as a result of that error. Crim.R. 33(E)(3)(5). Appellant asserts that two errors occurred during the trial court proceedings that prejudiced him: (1) he should have been allowed to impeach Sherry Schofield with her aforementioned affidavit; and (2) that trial counsel was ineffective for withdrawing the request for a jury view. Under appellant's other assignments of error, supra, we addressed each of these issues. We determined that the claims are without merit and that appellant suffered no prejudice. Similarly, we do not find appellant's claims any more meritorious couched in a motion for new trial than under the other assignments of error. See our discussion, supra.
 {¶ 205} Accordingly, based upon these reasons, we hereby overrule appellant's assignment of error and hereby affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.
If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the sixty day period.
The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, J.: Concurs in Judgment Only.
Evans, J.: Concurs in Judgment Opinion.
[2] Randall Schofield was fourteen years old and Jessica was ten at the time of the trial court proceedings.
[3] Ashley Schofield was three at the time of the proceedings below.
[4] The indictment further alleged that appellant had several prior domestic violence convictions. The prior convictions elevated the offense from a first degree misdemeanor to a fifth degree felony. See R.C.2919.25(D).
[5] Randall and Jessica, along with their cousin/half-sister, Ashley, were in Randall's bedroom when the fracas began.
[6] The parties stipulated to appellant's previous domestic violence convictions.
[7] {¶ a} At the outset, we note a jurisdictional issue with these two appeals. An otherwise final order is not appealable if there is an unresolved Crim.R. 33 motion for new trial. See e.g. State v. Untied
(Mar. 17, 2002), Muskingum App. No. CT2001-19; Columbus v. Triplett
(Dec. 14, 1999), Franklin App. No. 99AP-368; State v. Rhoden (Aug. 19, 1996), Pike App. No. 95CA562. Thus, the November 7, 2001 sentencing entry did not constitute a final appealable order in light of the fact that the trial court had not formally disposed of appellant's motion for new trial. Although the court ruled from the bench at the sentencing hearing and denied the motion, it is well-settled that courts speak through their journal and not through oral pronouncement. See Gaskins v. Shiplevy
(1996), 76 Ohio St.3d 380, 382, 667 N.E.2d 1194; State v. King (1994),70 Ohio St.3d 158, 162, 637 N.E.2d 903; Schenley v. Kauth (1953), 160 Ohio st. 109, 113 N.E.2d 625, at paragraph two of the syllabus. Thus, when no judgment entry journalizing a court's verbal decision has been filed, an appellate court has no jurisdiction to consider the matter.Byers v. Coppel (Nov. 29, 1999), Ross App. No. 99CA2488; also see generally White v. Vrable (Sep. 30, 1999), Franklin App. No. 98AP-1351, unreported; Wiltberger v. Davis (Jun. 30, 1994), Franklin App. No. 93AP-1031, unreported.
{¶ b} final judgment in this case was the March 18, 2002 entry that formally overruled appellant's motion for new trial. Technically, Case No. 01CA36 should have been dismissed for the lack of a final order and the assignments of error raised therein should have been included in Case No. 02CA13. Be that as it may, the issues are now before us and we will consider them.
[8] Apparently, no argument was presented regarding the excited utterance exception to the hearsay rule. See Evid.R. 803(2); State v.Ulis (1993), 91 Ohio App.3d 656, 633 N.E.2d 562; State v. Hunt (1989),63 Ohio App.3d 471, 579 N.E.2d 272.
[9] Interestingly, appellee did not object to this testimony. During Jessica's direct examination, supra, appellee did object to this question and the trial court sustained the objection. See footnote 8.
[10] We agree that both the appellant and the appellee agree that Husk's statement was not rendered admissible simply because Husk previously appeared at trial and was subject to cross-examination. See, also, Smith v. Seitz (July 8, 1998), Vinton App. No. 97CA515 citingUnited States v. Cheek (1978), 582 F.2d 668.
[11] {¶ a} Evid.R. 613(B) provides:
 {¶ b} "Extrinsic evidence of prior inconsistent statement of witness
 {¶ c} "Extrinsic evidence of prior inconsistent statement by a witness is admissible if both of the following apply:
 {¶ d} "(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require:
 {¶ e} "(2) The subject matter of the statement is one of the following:
 {¶ f} "(a) A fact that is of consequence to the determination of the action other than the credibility of a witness:
 {¶ g} "(b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(B) or 706:
 {¶ h} "(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence."
[12] This alleged statement was discussed in the context of Jessica's testimony that she observed Curt Husk look out his window and state "Oh, my gosh, Bill just hit your Mom." Appellant notes that Jessica's testimony flatly contradicted Husk's trial testimony.